Ex Parte Edward J. Higgins, for Mary E. Moynihan, Petitioner, v. Emmett F. Hoctor.—62 S. W. (2d) 410.

Division One, June 12, 1933.

*Hudson, Waxelman & Higgins* for petitioner.

*Roy McKittrick*, Attorney-General, *Wm. Orr Sawyers* and *Denton Dunn*, Assistant Attorney-Generals, for respondent.

1024

HYDE, C.—This is an application to this court for writ of *habeas corpus*. The application for writ, made by the attorneys for Mary E. Moynihan, states that she is unlawfully deprived of her liberty by the superintendent of the State Insane Hospital No. 4 at Farmington, Missouri. The writ was issued and it is shown by the return of the superintendent of the State Insane Hospital and the reply thereto of petitioner and the certified copies of the record attached to these pleadings that as stated in the statement in petitioner's brief:

''A proceeding to have Mary E. Moynihan, the petitioner herein, declared of unsound mind and incapable of managing her own affairs, was instituted in the Probate Court of St. Louis County, Missouri, on July 17, 1931, by the filing of an information in writing with Michael J. Moynihan, her husband, as the informant, alleging that the said Mary E. Moynihan was a person of unsound mind and incapable of managing her own affairs and praying the court to adjudge her a person of unsound mind and incapable of managing her own affairs.

''A summons was issued to the Sheriff of St. Louis County, Missouri, by Sam Hodgdon, who had theretofore been elected and had qualified and was acting as Judge of the Probate Court of St. Louis County, Missouri, ordering and directing the said Mary E.

Moynihan to appear in the St. Louis County Probate Court on the 7th day of August, 1931, to undergo a trial as to her sanity.

"It appears, however, that on July 17, 1931, at the same time the said Sheriff of the County of St. Louis served the said summons on the said Mary E. Moynihan, petitioner herein, she was then and there arrested and conveyed by the St. Louis County Sheriff to the State Insane Asylum at Farmington."

This arrest was made pursuant to the following order of the probate court, made July 17, 1931:

"Complaint of Michael J. Moynihan having been made to the Probate Court of the County of St. Louis that the above named Mary E. Moynihan *is so far disordered in her mind as to endanger her own person, and the person or property of others,* and has no guardian, and is not in the care or charge of any person, and that the court having heard testimony in regard to the facts complained of, does consider, adjudge, decree, order and direct that said Mary E. Moynihan be apprehended, restrained and confined in the State Hospital No. 4, Farmington, Missouri, and that the sheriff of this county shall apprehend said Mary E. Moynihan and deliver her at the said State Hospital No. 4, Farmington, Missouri, to the Superintendent thereof and that the said Superintendent be and he is hereby directed and empowered to confine her until the further order of this court."

Thereafter, on July 20, 1931, the following order was also made by the County Court of St. Louis County:

"And now it appearing to the court that the Probate Court in the County of St. Louis, State of Missouri, has filed information in writing that Mary E. Moynihan *is so far disordered in her mind as to endanger her own person and the person and property of others,* and has no guardian and is not in the care or charge of any person, and now the above cause coming on to be heard, and the facts as stated, being proven to the satisfaction of the court by the Probate Court, it is considered by the court that the said Mary E. Moynihan is so far disordered in her mind that she be apprehended, restrained and confined in the State Hospital No. 4, Farmington, Missouri. It is therefore ordered by the court that the said Mary E. Moynihan be admitted, restrained and confined in the State Hospital No. 4, Farmington, Missouri, as a county patient, until further order of this court, and that the clerk of this court make out and transmit to the Superintendent of said State Hospital No. 4 a certified copy of this order with the request that the said Mary E. Moynihan be admitted to said institution."

The probate court evidently acted under authority of Sections 498, 499, Revised Statutes 1929, and the county court under Sections 8645-9, Revised Statutes 1929. These latter sections were enacted

in 1909 (see Laws 1909, pp. 587-8) evidently to give the county court the duty of caring for indigent persons found to be insane. [See, also, Secs. 451 and 454, R. S. 1929; Redmond v. Q. O. & K. C. Railroad Co., 225 Mo. 721, 126 S. W. 159.]

As further stated in petitioner's brief: "On the 7th day of August, 1931, he (probate judge) had said case called for trial and appointed one Martin Rasmussen, an attorney at law, to represent the said Mary E. Moynihan, the petitioner herein. Immediately after appointment of said attorney, neither party having asked for a jury, the court proceeded to try the case, sitting as a jury, and without the defendant (petitioner herein) being present."

The judgment of the probate court, as shown by its record, was as follows:

"On information of Michael J. Moynihan filed in this court on the 17th day of July, 1931, and the hearing as to the alleged insanity of Mary E. Moynihan having been set for this day, and it appearing that Mary E. Moynihan was personally served with notice as required by law that an inquiry would be had on said date as to her sanity and that she was entitled to be present and be assisted by counsel; the court of its own motion doth therefore appoint Martin Rasmussen, an attorney, to represent her in this behalf, and there also comes the informant.

"The court finds that neither the party giving the information in writing, nor the party whose sanity is being inquired into has called for or demanded a jury, therefore, the facts are inquired into by the court sitting as a jury, and the court sitting as a jury having heard all the evidence and proofs adduced, doth find *that said Mary E. Moynihan is a person of unsound mind and incapable of managing her affairs.*

"Whereupon, it is ordered by the court in accordance with the finding, that said Mary E. Moynihan is a person of unsound mind and incapable of managing her affairs, the court doth thereupon appoint Michael J. Moynihan, guardian of the person and estate of said Mary E. Moynihan, and orders that he take charge of her estate, that before entering upon his duties as such guardian he execute a bond in the sum of $500 for the benefit of said estate.

"Said guardian now files his bond in the aforesaid sum, which bond is duly examined and approved.

"The above named Mary E. Moynihan having this day been declared by the court to be a person of unsound mind, and it appearing to the court from the evidence presented *that said Mary E. Moynihan is so far disordered in her mind as to endanger her own person and, property of others,* it is ordered, adjudged and decreed that said Mary E. Moynihan be restrained and confined in the State Hospital No. 4, Farmington, Missouri, and the Superintendent thereof is here-

by directed and empowered to confine the said Mary E. Moynihan in said State Hospital No. 4, Farmington, Missouri, until the further orders of this court.''

After this judgment in the probate court was entered on August 7, 1931, and another commitment to the State Insane Hospital had been issued by the probate court, there was made in the county court the following further order, on August 10, 1931:

''And now it appearing to the court that the Probate Court in the County of St. Louis, State of Missouri, has filed information in writing that Mary E. Moynihan is insane, and that she is a resident of the county of St. Louis, State of Missouri, and now the above cause coming on to be heard, and the facts as stated, being proven to the satisfaction of the court by the probate court, it is so considered by the court *that the said Mary E. Moynihan is insane, and a proper person to be sent to the State Hospital No. 4, Farmington, Missouri.* It is therefore ordered by the court that the said Mary E. Moynihan be sent to the State Hospital No. 4, Farmington, Missouri, to undergo treatment thereof as a county patient, and that the clerk of this court make out and transmit to the superintendent of said State Hospital No. 4 a certified copy of this order with the request that the said Mary E. Moynihan be admitted to said institution.''

Mary E. Moynihan is now held in State Insane Hospital No. 4 pursuant to said commitment and order. The contention made here in her behalf is that the proceedings in the St. Louis County Probate Court were void because Mary E. Moynihan was not permitted to be present at the hearing and because no jury was called to try the issues. This, it is contended, is in violation of both the Federal and State Constitutions. We have held, where it is contended the law under which a petitioner is restrained is unconstitutional, that *habeas corpus* is a proper remedy to test that question. [Ex parte Karnstrom, 297 Mo. 384, 249 S. W. 595; Ex parte Lerner, 281 Mo. 18, 218 S. W. 331; Ex parte Lucas, 160 Mo. 218, 61 S. W. 218; see, also, as to unconstitutional commitment of insane 29 C. J. 106, sec. 100.] Here, no claim is made that petitioner is, in fact, sane. The contention is that she has not been legally declared insane. It has been ruled that, ''although the confinment of an insane person is illegal, if his going at large will be dangerous to himself or to other people he will not be set at liberty under a writ of *habeas corpus,* but will be detained to permit a legal commitment to be secured under legal proceedings.'' [12 R. C. L. 1216, sec. 35; Ex parte Dagley (Okla.), 128 Pac. 699, 44 L. R. A. (N. S.) 389, and note.] We will, however, determine whether petitioner shall be remanded to the superintendent of the asylum under the commitment or returned to the probate court for further proceedings.

1028

■ The substance of the claim made on behalf of petitioner is that Sections 448 and 452, Revised Statutes 1929, authorizing such proceedings as were had here, are unconstitutional. These sections are as follows:

"Secton 448. If information in writing, verified by the informant on his best information and behalf, be given to the probate court that any person in its county is an idiot, lunatic or person of unsound mind, and incapable of managing his affairs, and praying that an inquiry thereinto be had, the court, if satisfied there is good cause for the exercise of its jurisdiction, shall cause the facts to be inquired into by a jury; *Provided*, that if *neither the party giving the information in writing, nor the party whose sanity is being inquired into call for or demand a jury, then the facts may be inquired into by the court sitting as a jury.* [This proviso was added in 1913. See Laws 1913, p. 94.]

"Section 452. *If it be found by* the jury or *the court sitting as a jury* that the subject of the inquiry is of unsound mind and incapable of managing his or her affairs, the court shall appoint a guardian of the person and estate of such insane person, such guardian to be a resident of the State." (Then follows a provision as to the procedure in case a public officer becomes insane. Apparently the Legislature had some misgivings about that.)

Petitioner says these sections violate the Fifth and Fourteenth Amendments to the Constitution of the United States, contending that authorizing the probate court to find a person insane and to appoint a guardian of his person and property, without having him present and without the verdict of a jury, deprives him of his liberty and property without due process of law. Petitioner also contends they violate, for the same reason, Section 30 of Article II of the Missouri Constitution. Notice is essential to due process of law. [Hunt v. Searcy, 167 Mo. 158, 67 S. W. 206; Shanklin v. Boyce, 275 Mo. 5, 204 S. W. 187; State ex rel. Terry v. Holtcamp, 330 Mo. 608, 51 S. W. (2d) 13.] However, "where due notice and an opportunity for a hearing have been given, the presence of the alleged insane person at the hearing is not essential to due process." [12 C. J. 1211, sec. 987.] Nor does due process of law require a trial by jury, even in all criminal cases. ■ Therefore, "in the absence of any provision to the contrary in the State Constitutions, the several State Legislatures may provide for the trial of accused persons without a jury, or before a jury of less than twelve; and may provide that failure to demand a jury in certain cases shall be a waiver of the right to a jury trial otherwise existing." [12 C. J. 1207, sec. 981, see, also, p. 1190, sec. 956; 6 R. C. L. 458, sec. 453, see, also, pp. 433-436, secs. 430-433.] Courts of equity have always determined issues of fact and constitutional provisions relating to jury trial do not apply to equitable actions. [35 C.

J. 159-162, secs. 30, 31, 16 R. C. L. 209, sec. 27.] Offenses against municipal ordinances were triable, at common law and before the adoption of our present Constitution, without a jury and are not required to be tried before a jury now. [Delaney v. Police Court of Kansas City, 167 Mo. 667, 67 S. W. 589; City of St. Louis v. Von Hoffmann, 312 Mo. 600, 280 S. W. 421; as to due process of law see, also, City of St. Louis v. Schefe, 167 Mo. 666, 67 S. W. 1100, affirmed Schefe v. City of St. Louis, 194 U. S. 373, 24 Sup. Ct. 676, 88 L. Ed. 1024; City of St. Louis v. Fischer, 167 Mo. 654, 67 S. W. 872, 64 L. R. A. 679, 99 Am. St. Rep. 614, affirmed Fischer v. City of St. Louis, 194 U., S. 361, 24 Sup. Ct. 673, 40 L. Ed. 1018.] This court said in the Delaney case: " 'Due process of law' does not necessarily mean a trial by jury. It simply means a day in court, according to the practice provided for such cases, involving, of course, notice and an opportunity to be heard before judgment is pronounced."

Concerning due process of law in insanity hearings, the Supreme Court of the United States said in Simon v. Craft, 182 U. S. 427, 21 Sup. Ct. 836, 45 L. Ed. 1165:

"The due process clause of the 14th Amendment does not necessitate that the proceedings in a state court should be by a particular mode, but only that there shall be a regular course of proceedings in which notice is given of the claim asserted, and an opportunity afforded to defend against it." [See, also, Chaloner v. Sherman, 242 U. S. 455, 37 Sup. Ct. 136, 61 L. Ed. 427; White v. White (Tex.), 196 S. W. 508, L. R. A. 1918A, 339.]

It seems to be rather generally held that at least to fulfill the requirement of due process of law "there is no right to a jury trial in proceedings to determine the question of a person's insanity, except where, as in some jurisdictions, the right is conferred by statute." [35 C. J. 182, sec. 71, and cases cited; 16 R. C. L. 205, sec. 23; see, also, 14 R. C. L. 560, sec. 11, 564, sec. 16.] Since an insanity hearing is a civil case, State ex rel. Peper v. Holtcamp, 235 Mo. 232, 138 S. W. 521, it would seem at least that due process of law does not require that there be a jury trial, whether demanded or not, and we so hold.

Petitioner further contends that Sections 448 and 452, Revised Statutes 1929, violate Section 28, of Article II, of our present Constitution, which states: "The right of trial by jury, as heretofore enjoyed, shall remain inviolate." This contention is that in insanity hearings there must be a jury trial whether demanded or not. This presents a question which has apparently never been decided in this State. It was suggested in National Board v. Fry, 293 Mo. 399, 239 S. W. 519, but the court said "the question of whether or not a person of unsound mind can waive a trial by jury as provided by this amendment (Laws 1913, p. 94), or whether

1030

the plaintiff can raise it, is not presented by the petition. We shall not go into these questions." Section 28 also provides: "A jury for the trial of criminal or civil cases, in courts not of record, may consist of less than twelve men, as may be prescribed by law." By the Amendment of 1900, a two-thirds majority of the jury may render a verdict in all civil cases in courts not of record and three-fourths of the jury may render a verdict in all civil cases in courts of record. After that amendment, in State ex rel. Peper v. Holtcamp, 235 Mo. 232, 138 S. W. 521, it was contended that Section 28 applied "only to cases wherein the right to a trial by jury existed at common law;" that the amendment could not affect an insanity inquiry wherein the right to a jury trial was given by statute only; that an insanity proceeding was not a civil case; and that, therefore, a three-fourths verdict was not valid in such proceedings. This court, however, held that an insanity inquiry was a civil case; that when tried by a jury only a three-fourths verdict was required; that the words "as heretofore enjoyed," were not limited only to common-law juries; that they meant "before and up to the time the Constitution was adopted;" and that "whatever was the *status* of that right at the time of the adoption of the Constitution of 1875 was the *status* referred to in that instrument." Many decisions of this court, although not using this exact language, seem to approve the same rule. [State v. Bockstruck, 136 Mo. 335, 38 S. W. 317; Creve Coeur Lake Ice Co. v. Tamm, 138 Mo. 385, 39 S. W. 791; Tinsley v. Kemry, 170 Mo. 310, 70 S. W. 691; Eckrich v. St. Louis Transit Co., 176 Mo. 621, 75 S. W. 755; Berry v. St. Louis & San Francisco Ry. Co., 223 Mo. 358, 122 S. W. 1032, 1043; Peniston v. Hydraulic Press Brick Co., 234 Mo. 698, 138 S. W. 532; Kansas City v. Smith, 238 Mo. 323, 141 S. W. 1103; Johnston v. Star Bucket Pump Co., 274 Mo. 414, 202 S. W. 1143; Bates v. Comstock Realty Co., 306 Mo. 312, 267 S. W. 641; Hickox v. McKinley, 311 Mo. 234, 278 S. W. 671; Renshaw v. Reynolds, 317 Mo. 484, 297 S. W. 374; St. Louis v. Smith, 325 Mo. 471, 30 S. W. (2d) 729.] In Ice Company v. Tamm, supra, this court held that the statute for referring long accounts to referees did not violate Section 28 of Article II because, "*the Constitutions of 1820 and 1865 neither prohibited* the courts from referring cases without the consent of either party," and that when the Constitution of 1875 was adopted by the people "they ratified the provision as to jury trial as it had been enjoyed previously thereto; that is to say, *they adopted it with the construction already placed upon it.*" In Kansas City v. Smith, supra, this court said: "Parties to legal proceedings cannot be deprived, without their consent, of a trial by jury, composed as at common law, of any issue of fact for the trial of which *it was necessary to call a jury when the first Constitution of this State was adopted.*" Also, in St. Louis v.

Smith, supra, quoting from the Bates and Hickox cases, this court further said: "If the right to a jury trial exists, it is by virtue of the Constitution in force at the time, whether it be that of 1820 or 1865, which merely guaranteed the continuance of the common law right and that right the Constitution of 1875 preserves but does not extend." The proper rule of construction, therefore, undoubtedly, is that the Constitution of 1875 preserves the right of trial by jury, as that right came from the common law or the territorial statutes, in exactly the same *status* as was guaranteed under the two preceding Constitutions, that is: *It is not the particular statutory method of procedure in force in 1875 which is guaranteed, but the procedure which the Legislature was authorized to adopt under the previous Constitutions.* Likewise, it only prevents the Legislature from adopting procedure limiting the right of trial by jury *which it was prevented from adopting by this provision in the bill of rights of the two previous Constitutions.*

▮ With these principles in mind, let us examine the claim of petitioner that a valid determination of the fact of insanity can be made only by a jury, whether demanded or not, and that one, whose sanity is being inquired into, cannot waive such a jury inquiry. Under the above rule for determination of rights preserved by Section 28 of Article II of the Constitution, we must inquire as to the status of the right to a jury, whether demanded or not, in such cases, before and up to the time the present Constitution was adopted. Missouri has had three Constitutions. Our first Constitution was adopted in 1820 and remained in force until 1865. It stated, in the Declaration of Rights contained in Article XIII, as follows: "Section 8. That the right of trial by jury shall remain inviolate." The Constitution of 1865, in force until 1875, contained exactly the same words, Article I, Section 17. What, then, was right to trial by jury in insanity hearings before and after the adoption of our original Constitution? The General Assembly of the Territory of Missouri in 1817 adopted a code of procedure in such cases, which remained in force until after the Constitution of 1820 was adopted when Missouri was admitted into the Union as a state, which provided:

"1. Upon information in writing being given to the circuit court, that any person in the county is of unsound mind, and on application that the fact may be inquired into, it shall be the duty of such court to inquire into the fact *either by jury or otherwise,* and if it is found that such person is of unsound mind and incapable of prudently managing his affairs, the said court may appoint a guardian over the person, property and effects of such person of unsound mind." [Missouri Territorial Laws, Chap. 191, p. 507; Acts of General Assembly of Territory of Missouri 1817, p. 44.]

This Territorial Act was carried over into the Revision of 1825 of

the statutes of the State of Missouri, after the adoption of the Constitution, except that the information in writing was required to be given to the probate court which was then established in each county (Vol. 1, R. S. 1825, pp. 269-270, secs. 5-6), instead of to the circuit court. The new statute further provided that the court ''shall cause the person so alleged to be insane to be brought before them and shall inquire into the facts *by jury or otherwise* and if it be found that such person is of unsound mind and incapable of prudently managing his or her own affairs the court shall appoint some fit person or persons as guardian or guardians.'' [Vol. 1, R. S. 1825, p. 429, sec. 1.] In 1835 a new and more comprehensive statutory code was enacted covering the whole subject of insane persons and the management of their estates. Probate courts were abolished and probate jurisdiction, including the whole matter of persons of unsound mind was transferred to the county courts already established under Sections 1 and 12, Article V, Constitution of 1820. [See R. S. 1835, pp. 155-6, secs. 1 and 9-15, p. 323, sec. 1.] The new statute stated that the court *''shall cause the facts to be inquired into by jury''* to determine the sanity of persons alleged to be of unsound mind. [R. S. 1835, p. 323, sec. 2.] Perhaps the Legislature considered a jury inquiry more essential in a county court which was largely an administrative body, than in a specialized court for handling probate matters. At any rate, an insanity inquiry was not a matter in which a jury trial was a matter of right, whether demanded or not, when our first Constitution was adopted. Nor did that right exist during the first fifteen years under that Constitution providing ''that the right of trial by jury shall remain inviolate.'' If the Legislature had the right to provide for such an inquiry *''by jury or otherwise''* in probate courts under the Bill of Rights in the first Constitution, does it not have the power under the present Constitution to provide that the inquiry may be by the court without a jury if no jury is demanded? The provision *''by jury or otherwise''* at least means if no jury is demanded the court *may* proceed without one, which is all that our present statute authorizes.

An insanity hearing is not to be compared to a criminal trial. The purpose is entirely different. The person alleged to be insane is accused of no crime or wrong. He is suffering from a disease of the mind or nerves and he as much as any one needs protection from its effects. It is not intended to deprive him of his property but to afford a means of preserving it. It is not intended to deprive him of his liberty as punishment but for his own protection and the protection of others from acts which he would not knowingly commit. It is intended to preserve all of his rights of both liberty and property until he is able to exercise them. At any early period in English history the custody of the person and property of the insane

became vested in the Crown as *parens patriae* and came under the jurisdiction of the Lord Chancellor, 32 C. J. 626, sec. 162; 14 R. C. L. 554, sec. 4; Buswell on Insanity, 40, sec. 28. The development of the early chancery procedure was reviewed by this court in State ex rel. Paxton v. Guinotte, 257 Mo. 1, 165 S. W. 718, as follows:

"Subsequently authority was given to the Lord Chancellor to issue the writ or commission to inquire as to the fact of idiocy or lunacy, and the method of procedure was by petition suggesting the lunacy. [Ibid.; Re Brown, 1 Abb. Pr. 108, 109.]

"It was the ordinary writ upon a supposed forfeiture to the crown, and the proceeding was in behalf of the king as the political father of his people. [Ibid.; Fitzherbert, De Natura Brevium, 581.]

"As the means devised to give the king his right by solemn matter of record, it was necessary before the sovereign could devest title. [3 Bl. Com. 259; Phillips v. Moore, 100 U. S. 208, 212, 125 L. Ed. 603, 604; Anderson Dict., title Office Found.]

"It was used to establish the fact upon which the king's rights depended, as in the case of an alien who could hold land until his alienage was authoritatively established by a public officer, upon an inquest held at the instance of the government. Whether the basis of action was infancy or alienage, or otherwise, the proceeding was in behalf of the public represented by the king. [Ibid.]

"The inquisition was *an inquiry made by a jury* before a sheriff, coroner, escheator or other government officer, *or by commissioners* specially appointed, concerning any matter that entitled the sovereign to the possession of lands or tenements, goods or chattels, by reason of an escheat, forfeiture, idiocy and the like. [Chitty, Prerog. 246, 250; Staunf. 55; Rapalje & L. L. Dict. title Inquest Office.]

"Thus the law came to us from England, and after the Revolution the care and custody of persons of unsound mind and the possession and control of their estates, which had belonged to the king as a part of his prerogatives, became vested in the people, who by an early act confided it to the chancellor and afterward to the courts."

Under the present laws of England and most of our states, when a person's sanity is inquired into, it is required that either "upon the original trial of the issue, or on appeal therefrom, such person may *as a matter of right*, obtain the verdict of a jury upon the facts and evidence produced." [Buswell on Insanity, p. 35, sec. 24.] The English statutes enacted after the adoption of our first Constitution provided:

"XLI. Where the alleged lunatic demands an inquiry before a jury, the Lord Chancellor intrusted as aforesaid shall in his order for inquiry direct the return of a jury, unless he be satisfied, by personal examination of the alleged lunatic, that he is not mentally

competent to form and express a wish for an inquiry before a jury; and the Lord Chancellor intrusted as aforesaid may, where he shall deem it necessary, after presentation of the petition for inquiry, and for the purpose of personal examination, require the alleged lunatic to attend him at such convenient time and place as he may appoint.

"XLII. Where the alleged lunatic does not demand an inquiry before a jury, or the Lord Chancellor intrusted as aforesaid is satisfied by personal examination of him that he is not mentally competent to form and express a wish in that behalf, and it appears to the Lord Chancellor intrusted as aforesaid, upon consideration of the evidence adduced before him on the petition for inquiry, and of the circumstances of the case, so far as they are before him, to be unnecessary or inexpedient that the inquiry should be before a jury, and he accordingly does not in his order for inquiry direct the return of a jury, then the Masters shall, by virtue of their General Commission, and under such order for inquiry; but without a jury, personally examine the alleged lunatic, and take such evidence, upon oath or otherwise, and call for such information, as they may think fit or the Lord Chancellor intrusted as aforesaid may direct, in order to ascertain whether or not the alleged lunatic is of unsound mind, and shall certify their finding thereon." [Lunacy Regulation Acts, 16 & 17 Vict. Cap. 70, XL-L; for later provisions see, also, 25 & 26 Vict. Cap. 96, secs. 8-12; In re Crompe, L. R. 4 Ch. App. 653.]

This court, in the Guinotte case, held that an insanity proceeding could not be dismissed by the informant who commenced it without the consent of the probate court, making the following observations concerning the State's interest in such matters:

"Who are the parties in interest in an inquest *de lunatico* under our statute? Manifestly (a) the public at large, that it may not suffer in person or property from the dangerous vagaries or mania of the individual alleged to be of unsound mind, and for that such person, by a dissipation of his property, may not become a charge upon the public purse, and (b) the person whose mind is under suspicion, the alleged crazy person, that he may not suffer from the detention of his property or person in the custody of another."

However, even though an insanity proceeding is primarily for the benefit of the person suspected of being insane, nevertheless depriving a person of his liberty and his freedom to do as he sees fit with his property and putting him under the stigma of irrationalism is such a serious matter that there should be, for the person whose sanity is inquired into, every proper safeguard. As this court said in the Searcy and Shanklin cases, declaring unconstitutional the statute authorizing such hearings without notice:

"If he be a raving maniac, he can appear by attorney or through

his friends, and see that a proper person is appointed guardian, or that a proper care is given to his property and to his person. In addition, what if the person was not really insane at all, and without notice was adjudged insane and confined in an asylum, and the management of his property given to another? In such contingency the propriety of notice would be manifest, and, if given, would defeat the recovery of a judgment. It will not do to say that, in the fifty-seven years that these provisions not requiring notice have been on the statute books, no instance is recorded of any sane person being so adjudged and deprived of his liberty or property, and that instances of such outrages are found only in highly colored and improbable stories in works of fiction. For the Marquis case (85 Mo. 615) is an instance in our own reports where a citizen was so adjudged insane without notice, and at the very next term of court appeared and proved that he was not, and never was, insane. But however the past experience may have been, the fact remains that the possibility of such an outrage being perpetrated is afforded by the statutory provisions referred to; and it is the duty of the courts, whenever the question arises, to prevent the happening of such a wrong, by declaring those provisions to be unconstitutional.''

Let us consider what safeguards are provided by our statutes. The essential provisions, concerning insanity hearings and the care and custody of persons of unsound mind, contained in the Revision of 1835, above referred to, have come down to the present time with little change as to essential plan, and are now a part of Article 18 of Chapter 1, Revised Statutes 1929. The original provision appearing in the statutes of 1825, for bringing the person alleged to be of unsound mind before the court was left out of the Revision of 1835, but was reenacted in the Revision of 1845. [See R. S. 1835, p. 323, secs. 2, 3, 4 and 7, p. 326, sec. 39, p. 327, secs. 45 and 46; R. S. 1845, Chap. 85, secs. 1, 3 and 4, p. 593, secs. 7 and 8, p. 594, sec. 39, p. 598, secs. 45 and 46, p. 599; R. S. 1855, Chap. 81, secs. 1, 3, 4 and 5, p. 864, sec. 8, p. 865, sec. 39, p. 869, secs. 45 and 46, p. 870; General Statutes, 1865, Chap. 40, secs. 1, 3, 4, 5, 8, 39, 45 and 46.] Under the Constitution of 1865, which contained similar provisions for courts as did the original Constitution, the probate jurisdiction remained in the county courts. [See Article VI, secs. 1 and 13, Constitution of 1865.] It seems that between 1835 and 1865, the only probate court in existence were those established by special acts. [See General Statutes of 1865, p. 900, for probate courts of St. Louis County.] Sections 1, 3, 4, 5, 8, 39, 45 and 46, Chapter 40 of General Statutes of 1865 were after the adoption of the Constitution of 1875 reenacted in the Revision of 1879 in exactly the same language except that the probate court is stated to be the tribunal having jurisdiction of all matters concerning insane persons, as provided by Sections 1

and 34 of Article VI, of the Constitution of 1875. [See Secs. 5787, 5789, 5790, 5791, 5794, 5823, 5828 and 5829, R. S. 1879.] At that time, however, the provision for bringing the person informed against as insane before the court was repealed and the provision, declared unconstitutional in the Searcy and Shanklin cases, for proceeding without either requiring him to be present or to have notice, was adopted. ■ This defect was remedied in 1917 after the latter decision by requiring service of reasonable notice on the alleged insane person. [Laws 1911, p. 102, now Sec. 450, R. S. 1929.] This court has recently held that this requirement of reasonable notice cannot be waived by the party alleged to be incompetent or his attorney. [State ex rel. Terry v. Holtkamp, 330 Mo. 608, 51 S. W. (2d) 13; State ex rel. Townsend v. Mueller, 330 Mo. 641, 51 S. W. (2d) 8.] As to the right to arrest and restrain until hearing one who is so deranged as to endanger himself or others as done in this case and as provided for by Sections 498, 499, Revised Statutes 1929, see notes 10 A. L. R. 488, and 45 A. L. R. 1464.

■■ Section 450 further provides: "If no licensed attorney appears for the alleged insane person at such hearing, then the court shall appoint an attorney to represent such person in such proceeding." Thus, a person whose sanity is questioned is always represented by an attorney, in the nature of a guardian *ad litem*, who like others acting in such a capacity has not merely perfunctory duties but is expected "to do for him what with riper judgment he would do for himself." [Spotts v. Spotts, 331 Mo. 917, 55 S. W. (2d) 977.] Therefore, not only does the person under investigation have the right to appear and to be represented by counsel of his own choice or by counsel his relatives or friends may employ if he is unable to do this himself (and in either case have the facts inquired into by a jury) but he is furnished counsel by the court's appointment if no one appears to represent him (who may likewise call for a jury). Furthermore, even if he has been found insane either by the verdict of a jury or the court sitting as a jury, the court may for cause "set the same aside, and cause a new inquisition into the facts." [Sec. 456, R. S. 1929.] In addition to this procedure provided in the probate court, there is the right to appeal to the circuit court and have a trial *de novo* before a jury there. [In re McMenamy's Estate, 307 Mo. 98, 270 S. W. 662; In re Tannory (Mo. App.), 2 S. W. (2d) 189; Sec. 292, R. S. 1929.] Such an appeal may be taken "by any attorney for the person alleged to be insane, or by any relative of such person, or any reputable citizen of the county." [Sec. 285, R. S. 1929.] The right to have a jury on appeal has been held sufficient to preserve the right of trial by jury. [Black Hawk Co. v. Springer (Iowa), 10 N. W. 791; and see In re Bresee (Iowa), 48 N. W. 991; see, also, White v. White (Tex.), 196 S. W. 508, L. R. A. 1918A, 349,

holding an act unconstitutional which provided for no appeal where trial by jury could be had; see, also, Warrick v. Moore Co. (Tex.), 291 S. W. 950; Ex parte Dagley (Okla.), 128 Pac. 699, citing many cases holding a compulsory jury trial is not essential.] Moreover, upon affidavit "that any person who has heretofore been declared by such court to be of unsound mind, or insane, has been restored to his right mind, the court shall hold an inquiry." [Sec. 493, R. S. 1929.] Under that section also the further provision is made that the court, if it does not find him sane, *shall,* upon further application, "cause the facts to be inquired into by a jury." This statutory scheme provides at least four separate and distinct occasions when a trial by jury may be had. It is only necessary to ask for it. We cannot hold that this plan fails to preserve the *right of trial by jury inviolate.* There may be difference of opinion as to whether as an additional safeguard a trial by jury in the first instance should be compulsory but that is for the Legislature.

It is contended, however, that all these provisions do not actually preserve the right because one who is insane cannot waive anything and his act in waiving a jury is just as void as his conveyance of property or any other act he may attempt. Of course, the fact that he had no right to a jury inquiry, whether demanded or not, before the adoption of a Constitution nor under the first Constitution adopted is a sufficient answer to this contention. However, it is also sufficient that *the right exists* and that one who is sane and able to ask for a jury can have one; that one who is not sane, if unable to either make a valid request or a valid waiver must in any event make such request and do every other act necessary to the conduct of a trial through some one who is qualified to represent him, and can have a jury if his relatives or friends provide counsel to represent him who asks for one; that if no one is representing him, the court appoints an attorney for him whose duty it is to investigate the facts and ask for a jury trial if one seems advisable; and, finally, that from the decision of the probate court sitting as a jury, there lies an appeal to the circuit court, which may be taken for him by anyone interested, where a trial *de novo* before a jury may be had. It is said in the Searcy and Shanklin cases that to say notice to an insane person is unnecessary because it is useless, begs the question since the purpose of the inquiry is to determine the matter of sanity. It would likewise beg the question here to say that a jury trial was unnecessary because if petitioner was insane it would make no difference whether a court or jury found that fact, and we do not say that. But if one who is insane cannot have a legal trial without a jury, because he cannot legally demand or waive it, would it not follow that his trial would also be invalid because he cannot examine

and challenge the jurors, see that he is confronted by the witnesses and cross-examine them, subpoena witnesses in his own behalf, make objections and take exceptions to incompetent evidence and to other prejudicial matters or rulings occurring in the course of the trial, and also because he would be deprived of counsel since he cannot make a contract with an attorney to represent him and cannot legally waive these rights? Of course, if he is to have a trial at all someone *sui juris* must appear and attend to the preservation of these important rights for him. Why cannot his representative also enforce his right to a trial by jury? In fact, the application for *habeas corpus* here is not signed by Mary E. Moynihan but by an attorney in her behalf, and it is not even shown that she could sign it or knows anything about it. Recognizing that one of unsound mind cannot act for himself, our statute provides for counsel to represent him if he or others do not provide counsel. We, therefore, hold that a person alleged to be insane has the right under Section 448, Revised Statutes 1929, to a trial by jury in the probate court, if a trial by jury is demanded either by such person or by counsel acting in his behalf; that it is not essential that he have the right to a trial by jury there, whether demanded or not; and that the acts of the Legislature providing this procedure for insanity hearings is not unconstitutional, because a jury trial is not made compulsory, when the right to have it is preserved both in the first instance and on appeal and the further provision is made for appointment of counsel who can enforce this right for one who is unable to do it for himself.

One other matter should be considered and that is whether or not the statutory requirements have been followed in this case. If it was proved or if it appeared from the face of the record that petitioner's constitutional rights were disregarded, the judgment would be void. While the statutes covering the whole subject of insanity are constitutional and amply safeguard the rights of persons whose sanity is inquired into, the probate courts should observe the spirit as well as the letter of these laws. Acting under Sections 498, 499, Revised Statutes 1929, it was proper for the court to order the temporary restraint and confinement of Mary E. Moynihan if it had reasonable grounds to believe that she was "so far disordered in her mind as to endanger her own person or the person or property of others." "As the inherent jurisdiction of the state over persons of unsound mind rests in part upon its duty to protect the community from the acts of those who are not under the guidance of reason, it follows, . . . that if any person is so insane that his remaining at liberty would be dangerous to himself or the community, any other person may, without warrant, or other authority than the inherent necessity of the case, confine such dangerous insane person,

but only during so long a time as may be necessary to institute and carry to a determination proper proceedings to inquire into the party's condition and provide for his legal custody.'' [Buswell on Insanity, p. 33, sec. 23. See, also, notes, 10 A. L. R. 488 and 45 A. L. R. 1464.] But even in such circumstances, it should be remembered that the preliminary order authorized by Sections 498, 499, Revised Statutes 1929, is not a valid final adjudication of the fact of insanity. The hearing provided by Section 452, Revised Statutes 1929, must still be had and the person suspected of insanity still ''is *entitled* to be present at said hearing and to be assisted by counsel,'' as stated in the notice required by Section 450, Revised Statutes 1929. The practice of sending a person to an insane asylum before the hearing might result in preventing the person claimed to be insane from employing counsel or being present at the hearing. Of course there may be circumstances when such action is advisable and where there is no other suitable place available except at great expense, but such action should be taken with caution not to impair the rights of the alleged insane person. The probate court has statutory authority to call a special term (Sec. 449, R. S. 1929) when speedy action is necessary, and five days, under Section 760, Revised Statutes 1929, is ordinarily sufficient notice. [See State ex rel. Terry v. Holtkamp, 330 Mo. 608, 51 S. W. (2d) l. c. 19.]

██ However, such an order for temporary restraint, as made by the probate court here, is not binding upon the superintendent of a State Hospital to keep the person confined until an order is made in that court for release. It is in no sense like a commitment in a criminal case for a definite term in jail or in the penitentiary. The person may lawfully be either discharged or paroled and set at liberty by the superintendent of his own motion at any time. [Sec. 8629. R. S. 1929.] The hospital is a State institution. [Chap. 46, Arts. 1 and 2. R. S. 1929.] The superintendent is one skilled in the treatment of mental diseases. [Sec. 8578, R. S. 1929.] ██ He is better qualified to determine a person's mental condition and the necessity for his confinement than the probate judge. He is a public officer and improper action on his part will not be presumed. If the person confined desires counsel or to attend the hearing of which he has notice, he has that constitutional right and it would be the duty of the superintendent to allow it, even with the precaution of an attendant if he thought that necessary. Moreover, as we have pointed out, to preserve the right of the person alleged to be insane to be represented, the court is required to appoint an attorney for that purpose. It is, of course, the duty of this attorney to inquire into the circumstances to determine and inform the court whether or not the alleged insane person ought to be present, and if so to ask the court to continue the hearing for that purpose. ██

It is true that the record here shows that Mary E. Moynihan was ordered confined in State Hospital No. 4 until further order of the probate court and that she was not present at the hearing at which she was adjudicated to be insane, but it is also shown that an attorney was appointed to represent her and, in the absence of any showing otherwise, it must be presumed both that he investigated the reason for her absence and the propriety of having her present. It must also be presumed that there were reasonable grounds for the preliminary order of the probate court for her restraint at the State Hospital. It is neither alleged nor claimed here that she is now or was then sane; that she is not now or was not then so far disordered in her mind as to endanger her own person or the person and property of others; that she asked to see or employ counsel but was not permitted to do so; that she had any desire or made any request to attend the hearing or even was in such condition that it would have been possible for her to do so; that any one, either informant, probate judge, her appointed attorney, or the State Hospital superintendent, acted dishonestly or fraudulently; nor that any different result could be reached at another hearing.

If this was a case like In re Marquis, 85 Mo. 615, we would not hesitate to order petitioner discharged. There, after an adjudication of insanity, the alleged insane person appeared at the next term of the probate court "and moved the court to set aside the judgment and the order appointing said guardian, alleging as ground therefor that notice had not been given him of said proceedings; that he was not of unsound mind, and the fact that such proceedings had been instituted against him was concealed from him, and that he was in proper condition to be notified and brought into court." There, the probate court sustained the motion and this court upheld its action, saying: "The proceedings under the law concerning insane persons are not like a final judgment, which is unalterable after the end of the term at which it was rendered. They are *in fiere*, like a cause pending, and irregularities in them or defects of the record may be obviated at any time so long as the lunatic is under the control of the guardian appointed for him. It was competent for the court to discharge the lunatic at any time from the care and custody of the guardian so soon as it was informed of the irregularity of the proceeding." The right to such relief is in addition to all the other statutory proceedings hereinabove described, but it is not claimed, in this case, that any such condition exists. It was not and is not now too late to ask the probate court for this relief or that provided by Section 493, Revised Statutes 1929, either of which would, if petitioner was entitled to it, be more effective than the relief we would grant upon this application for *habeas corpus*, which could, under the showing here, only be to return her to the custody of that

court for further proceedings. We, therefore, hold that petitioner is not in this case shown to be unlawfully restrained.

It is ordered that Mary E. Moynihan be remanded to the custody of the Superintendent of State Insane Hospital Number Four at Farmington. *Ferguson* and *Sturgis, CC.,* concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All of the judges concur.